IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF JEREMIAH L.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF JEREMIAH L., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JUSTIN L., APPELLANT.

Filed March 23, 2021.    No. A-20-704.

Appeal from the County Court for Hall County: JOHN P. RADEMACHER, Judge. Affirmed.

Mitchell C. Stehlik, of Stehlik Law Firm, P.C., L.L.O., for appellant.

Katharine J. Collins, Deputy Hall County Attorney, for appellee.

MOORE, RIEDMANN, and BISHOP, Judges.

MOORE, Judge.

## I. INTRODUCTION

Justin L. appeals from the decision of the county court for Hall County, sitting as a juvenile court, terminating his parental rights to his child, Jeremiah L. For the following reasons, we affirm.

## II.STATEMENT OF FACTS

### 1. PROCEDURAL BACKGROUND

Justin and Meaghan L. are the parents of Jeremiah, who was born in February 2018. At the time of Jeremiah's birth, Justin and Meaghan were already working with the Department of Health and Human Services (DHHS) regarding Jeremiah's two older siblings, who had been placed in DHHS custody in 2017 due to allegations of physical abuse and Justin's alcohol abuse. On January 11, 2019, the State filed a juvenile petition alleging Jeremiah lacked proper parental care by reason

- 1 -

of the fault or habits of his parents and was in a situation dangerous to life or limb or injurious to his health or morals. Specifically, the petition alleged:

> Jeremiah's siblings were previously placed into DHHS custody in February 2017 because of domestic violence, dad's alcohol abuse and physical abuse. In September 2018, the older children were placed with mom while dad was incarcerated. DHHS has received reports that dad has been abusive towards the children, including shaking and throwing Jeremiah. Dad continues to drink and will not participate in court ordered treatment. Mom admits that she is not following the safety plan, which included having dad's visits with the children be supervised.

Jeremiah was removed from the parents and placed in DHHS custody on the same day the petition was filed.

An adjudication hearing was held on July 2, 2019. The court sustained the allegations of the petition, finding that "Jeremiah is in harm and continues to be in harm" and adjudicated Jeremiah as a juvenile under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). This court affirmed the decision in a memorandum opinion. See *In re Interest of Jeremiah L.*, No. A-19-692, 2020 WL 1683107 (Neb. App. Apr. 7, 2020) (selected for posting to court website).

The guardian ad litem (GAL) initially filed a motion to terminate both Justin and Meaghan's parental rights on July 8, 2019. On July 9, the court ordered that Justin and Meaghan have supervised visits with Jeremiah at least two times per week for three hours per visit, with the option to increase visitation at the discretion of DHHS. On September 17, 2019, the court denied a motion to suspend visitation and a motion for alcohol testing, finding no evidence that either parent had been under the influence during visits with Jeremiah, but stated that future visits will be terminated immediately if the parents are found to be under the influence. Status hearings were held on October 1, 2019, and March 3, 2020, at which it was determined that there was no change in prior findings and Jeremiah's out-of-home placement should continue with reasonable visitation. Justin filed a motion to change visitation, which the court denied on January 7, 2020, ordering that the visitation schedule remain the same.

On May 12, 2020, DHHS sent a notice informing the court that Jeremiah was being moved from an agency based foster home to a relative foster home on May 22, 2020. Justin filed an objection to the change in placement. On May 26, a hearing was held on Justin's objection and the court ordered DHHS to create a case plan. The court overruled Justin's objection, pending resolution of the petition to terminate Justin's parental rights.

A case plan was filed on May 29, 2020. The case plan set forth four goals: (1) that Justin will have age appropriate interactions with Jeremiah, including appropriate supervision and discipline; (2) that Justin will refrain from having altercations that are dangerous to Jeremiah when he is present; (3) that Justin will maintain sobriety and his mental health; and (4) that Jeremiah will receive permanency through adoption. Justin filed an objection to the case plan on May 31, 2020. The court adopted the May 29 case plan on June 23; however, it amended the case plan to provide a concurrent plan of reunification.

On May 14, 2020, the GAL filed an amended motion to terminate Justin's rights only, as Meaghan had voluntarily relinquished her parental rights to Jeremiah in April. The amended motion alleged that termination was proper under Neb. Rev. Stat. § 43-292 (2), (4), and (7)

(Reissue 2016) and that termination would be in Jeremiah's best interests. The termination hearing was held on August 11, 2020.

## 2. Termination Hearing

At the termination trial, the court received in evidence the bill of exceptions from the termination hearing involving Justin's two older children and certified copies of complaints from Justin's open criminal cases. The following testimony was heard.

### (a) Justin's History

Jacie Boelts, a child and family services specialist with DHHS, was involved with Jeremiah's case from "June or July of 2019" until the time of the termination hearing. Boelts testified that Justin's parental rights to his two older sons had been terminated in August 2019 due to concerns regarding Justin's alcohol use, the relationship between the parents, possible domestic violence, and the parents' mental health. Boelts indicated that these same concerns are still present, particularly due to Justin's continued alcohol use.

When Jeremiah's case was transferred to Boelts from a previous caseworker, she was made aware of Justin's criminal history. Justin was convicted in 2014 of driving under the influence. As part of the terms of probation for his DUI charge, Justin was required to refrain from the consumption of alcohol, which he failed to do. In 2015, Justin was charged with refusal to submit to a chemical test. In 2017, Justin was convicted of driving under the influence, second offense, for which he was sentenced to 1 year in jail along with 1 year of postrelease supervision. Boelts testified that she was working on the case toward the end of Justin's term of postrelease supervision for his 2017 DUI charge, and she observed Justin violating the conditions of his postrelease supervision by failing to abstain from alcohol during that time.

At the time of trial, Boelts was aware that Justin had pending charges for second-degree assault, use of a deadly weapon to commit a felony, and resisting arrest. Boelts thought that alcohol was involved in that case. Justin also had pending charges at the time of trial for another count of driving under the influence, speeding, operating a motor vehicle during a 15-year suspension, and open container violation, all of which occurred in June 2020.

Several Grand Island Police Department officers testified about their interactions with Justin. Officer Megan Johnson testified that on December 7, 2019, she responded to a call at Justin and Meaghan's apartment after a neighbor called with concerns about a domestic disturbance. When Johnson arrived on scene, Justin was agitated and showed signs of intoxication. Johnson stated that Justin was trying to physically interfere with the investigation and was therefore arrested and charged with obstruction, resisting arrest, and terroristic threats. Johnson testified that prior to the incident on December 7, she had at least two other interactions with Justin regarding domestic disturbances involving alcohol. Johnson also testified that in the weeks prior to trial, she responded to calls at Meaghan's apartment and when she arrived on scene, Justin was there.

Officer Damion McAlvey testified that on February 8, 2020, he was called to Justin and Meaghan's apartment to respond to a domestic assault. Upon arriving on scene, McAlvey observed Justin outside, and he appeared erratic and possibly under the influence of alcohol. Justin told McAlvey that he had an argument with Meaghan and that Meaghan had slipped on the couch and hit her head against a wall. McAlvey observed a cut on Meaghan's forehead. McAlvey testified

that when other officers attempted to place Justin in custody for domestic assault, he fought the officers, including kicking McAlvey.

Officer Justin Roerich also testified regarding the February 2020 incident. Roerich testified that when he approached the apartment, he could hear screaming from inside. Roerich indicated that Justin appeared intoxicated and was acting obnoxious and belligerent with the officers. Roerich stated that in his experience as a police officer, he had interacted with Justin at least 10 times and that during those interactions Justin had never been sober. Roerich testified that he asked Justin if he hit Meaghan with a bottle, which Justin denied. Roerich also testified that Justin resisted arrest and that officers had to use force to secure him.

Grand Island Police Officer Tyler Herrold, a certified drug recognition expert, testified that he has had "at least 5 to 10" interactions with Justin during his 4 years with the police department. Herrold testified that he was also on scene during the February 2020 incident, and observed that Justin was intoxicated. Herrold testified that he interviewed Meaghan regarding the incident and she reported that Justin hit her in the head with beer bottle. Herrold observed that Meaghan had a laceration on her forehead that was consistent with the bottom edge of a glass bottle. No children were present at the time of the incident. However, Herrold testified that he recalled at least one domestic disturbance incident where children were present at the time he responded to the call.

Officers Herrold and Roerich testified that on August 8, 2020, the weekend prior to trial, they got called to the same apartment because Meaghan had reported that Justin had stolen money from her. Justin told Roerich that he had been staying at Meaghan's apartment for a few months. Roerich recalled that Justin appeared intoxicated and that he admitted to drinking all day. Justin denied stealing any money, but he did admit to borrowing money that he agreed to pay back. No children were present during this incident.

(b) Substance Abuse Treatment

Justin completed alcohol and substance abuse treatment at Valley Hope in early 2019. Boelts testified that when she took over Justin's case, he told her that he stopped attending aftercare or individual treatment for alcohol concerns after his parental rights to Jeremiah's older siblings were terminated in August 2019. Boelts believed that alcohol use continued to be a concern in this case and in her time working with Justin, he had not completed any treatment for his alcohol use, except for maybe attending one counseling session. Lacy Kaiser, with Better Living Counseling Services, began supervising Jeremiah's visits with his parents in November 2019. She testified that in the two months prior to the termination hearing, Justin told her that he did not need a therapist.

Boelts indicated that Justin asked for financial support to complete a co-occurring evaluation in May of 2020, and that she offered to provide gas vouchers to help him offset the costs. According to Boelts, a co-occurring evaluation costs between $200 and $250. Kaiser testified that in her time supervising visitation, Justin never indicated that he was having any financial issues. Further, Kaiser indicated that Justin reported spending $1,500 on fireworks in July 2020 and that he had recently purchased a new car. Boelts noted that these purchases exceeded the cost of an evaluation, and therefore Justin could have taken steps to complete an evaluation had he wanted to.

### (c) Visitation

Boelts testified that from June or July through December of 2019, Justin had scheduled visits for six hours per week along with Meaghan at their home to promote a family environment. Visits were always supervised due to continued concerns with alcohol use, domestic violence between the parents, mental health concerns, and lack of progress throughout the case. Boelts testified that during these home visits, Justin only had minimal interactions with Jeremiah, and usually spent the time sleeping or playing on his phone rather than participating. During team meetings, Justin explained that he was not participating because it was the mother's job to care for the child and that it was a man's job to have a job and provide for the family. Kaiser similarly testified that although Justin was physically present during visits, he was typically in a bedroom sleeping and not participating in the visit.

Visitation was paused from December 7, 2019, through April 16, 2020, because Justin was incarcerated twice within this time as a result of the domestic incidents in December 2019 and February 2020 noted above. Following his release from jail, Justin's visits with Jeremiah took place virtually due to concerns with COVID-19 until June 2020, when in-person visits resumed either at a visitation center or in a park in the community. Kaiser testified that during the virtual visits, Justin would talk to Jeremiah while Jeremiah played with toys.

Boelts testified that Justin attended most of the in-person visits after June 2020, and only missed a few due to job interviews and a car accident. Kaiser testified that when in-person visits resumed, Justin would typically spend the time following Jeremiah around the park while he played, feed him lunch, and change his diaper. Kaiser never observed Justin with alcoholic beverages during the visits. Kaiser testified that Jeremiah has fun during visits with Justin, but that she did not observe any affection between them. Kaiser noted that the only evidence of a bond between Justin and Jeremiah consisted of Jeremiah saying "dad" a few times at the start of each visit.

### (d) Lack of Progress Toward Reunification

Boelts testified that since Jeremiah was removed in January of 2019, he had not returned to Justin's care and has remained in an out-of-home placement. Boelts stated that Justin does not have the skills to be a full-time parent to Jeremiah, specifically noting his continued alcohol use, his failure to address his alcohol issues, and his lack of progress in regards to his mental health.

Boelts also had continued concern relating to Justin's relationship with Meagan and the domestic violence that occurred between them. At the time of trial, Justin and Meaghan were divorced but Justin's vehicle had been photographed at Meaghan's residence, which caused Boelts to have concerns that the two were still together. Boelts opined that it would be in Jeremiah's best interests for Justin's parental rights to be terminated.

### 3. TERMINATION

On September 15, 2020, the trial court terminated Justin's parental rights pursuant to § 43-292(2), (4), and (7) and finding that termination was in Jeremiah's best interests. Justin now appeals.

### III. ASSIGNMENT OF ERROR

Justin assigns that the trial court erred in terminating his parental rights.

### IV. STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Taeson D.*, 305 Neb. 279, 939 N.W.2d 832 (2020). When the evidence is in conflict, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016).

### V. ANALYSIS

#### 1. STATUTORY GROUNDS

In order to terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that the termination is in the child's best interests. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

In its order terminating Justin's parental rights to Jeremiah, the county court found that statutory grounds existed pursuant to § 43-292(2) (substantial and continuous or repeated neglect of juvenile or a sibling), (4) (parent is unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior which is seriously detrimental to the health, morals, or well-being of the juvenile), and (7) (juvenile has been in an out-of-home placement for 15 or more of the most recent 22 months).

Pursuant to § 43-292(7), the court may terminate parental rights when the court finds that the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. Justin does not dispute that a statutory basis for termination exists in that Jeremiah had been out of the home for 15 out of the last 22 months. Jeremiah was removed from the home on January 11, 2019, and remained in an out-of-home placement through the time of trial, which was August 11, 2020, for a total of 19 months. Based on the record, it is clear that the trial court did not err in finding that there was a statutory basis to support termination under § 43-292(7).

We need not consider whether termination of Justin's parental rights was proper pursuant to § 43-292(2) and (4) since any one of the 11 grounds identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

#### 2. BEST INTERESTS

In addition to proving a statutory ground, it must be shown that termination is in the best interests of the child. See *In re Interest of Austin G.*, 24 Neb. App. 773, 898 N.W.2d 385 (2017). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when it has been proven that the parent is unfit. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *In re Interest of Nicole M.,* 287 Neb. 685, 844 N.W.2d 65 (2014). Parental

unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

Justin asserts that the State failed to prove that he was an unfit parent because the record showed that he attended visits with Jeremiah, attempted to get a job, asked for help obtaining an evaluation, attended treatment at Valley Hope, and he has a relationship with Jeremiah because Jeremiah has called him "dad."

Prior to his incarcerations from December 2019 through April 2020, the record showed that Justin failed to fully participate in visits with Jeremiah. Although Justin was physically present at these visits, Kaiser and Boelts testified that Justin failed to interact with Jeremiah and spent the visits sleeping or on his phone. Following his incarcerations, Kaiser testified that Justin was more participatory, and that he generally spent visits following Jeremiah around the park. Boelts testified that although Justin's participation improved, he was never able to obtain any unsupervised visits with Jeremiah because of the overall lack of progress in the case. While Justin pointed to evidence that he had a relationship with Jeremiah because Jeremiah "says dad more often," Kaiser noted that there was no affection between Justin and Jeremiah. A few months of consistency does not overcome years of neglect and instability. See *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012).

Justin asserts in his brief that he made attempts to get a job, however, the only evidence of his job search in the record is a few instances where he mentioned interviews and missed visitation because of them. His lack of employment also contributed to his inability to complete a co-occurring evaluation, as he told Boelts he was unable to pay for the evaluation. However, 2 months after he reported being unable to pay for the evaluation, he told Kaiser that he had recently spent $1,500 on fireworks and that he had just purchased a new car. Despite offers from DHHS to provide gas vouchers for Justin to get to the evaluation, he failed to complete one. Justin made a clear choice to support his hobbies and personal interests rather than spending money that could have benefitted his relationship with his child.

Although Justin had successfully completed alcohol and substance abuse treatment at Valley Hope in early 2019, he stopped attending aftercare and individual treatment when his parental rights of Jeremiah's older siblings were terminated in August 2019. Further, Justin continued to consume alcohol and he had several interventions by law enforcement officers due to his belligerent behavior, including a few days before trial. During these law enforcement encounters, it appeared that Justin had been consuming alcohol. Therefore, the record supports a finding that Justin has failed to make progress with regard to his alcohol use and he is not in a position to safely parent Jeremiah. Not only was Justin unable to rehabilitate himself with regard to his two older children, he has failed to do so for Jeremiah's sake. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 862 N.W.2d 803 (2015); *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Furthermore, children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jahon S., supra.*

For these reasons, we conclude that the county court did not err in finding that the best interests of Jeremiah support termination of Justin's parental rights.

## VI. CONCLUSION

For the reasons stated above, we affirm the order of the county court terminating Justin's parental rights to Jeremiah.

AFFIRMED.