Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/10/2024 06:08 PM CDT

**In re Interest of Jeovani H., a child
under 18 years of age.
State of Nebraska, appellee, v.
Jeovani H., appellant.**

___ N.W.3d ___

Filed May 24, 2024.    No. S-23-831.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of facts over the other.

2. **Juvenile Courts.** A juvenile court has broad discretion as to the disposition of a delinquent child.

3. **Juvenile Courts: Minors.** The foremost purpose and objective of the Nebraska Juvenile Code is to promote and protect the juvenile's best interests, and the juvenile code must be liberally construed to serve the best interests of juveniles who fall within it.

4. **Juvenile Courts: Restitution.** In juvenile delinquency proceedings, orders of restitution are authorized by Neb. Rev. Stat. § 43-286(1)(a) (Cum. Supp. 2022) when such orders are in the interest of the juvenile's reformation or rehabilitation.

5. \_\_\_\_: \_\_\_\_. Pursuant to Neb. Rev. Stat. § 43-286(1)(a) (Cum. Supp. 2022), a juvenile court may order restitution not only for damaged or stolen property, but also for medical expenses.

6. \_\_\_\_: \_\_\_\_. An appropriate restitution order serves the salutary purpose of making juvenile offenders understand that they have harmed not merely society in the abstract, but also individual human beings, and that they have a responsibility to the victim. But this salutary purpose is undermined by imposing a restitution order that the juvenile is financially unable to pay.

7. ____: ____. When a juvenile court enters an order of restitution under Neb. Rev. Stat. § 43-286(1)(a) (Cum. Supp. 2022), it should consider, among other factors, the juvenile's earning ability, employment status, financial resources, and other obligations.

8. **Juvenile Courts: Restitution: Time.** A juvenile court's restitution order should contain specific requirements and time commitments as to when restitution must be paid and should be set in an amount that is within the realistic ability of the juvenile to pay within a reasonable period of time.

9. ____: ____: ____. A juvenile court may order that restitution be made immediately, in specific installments, or within a specified period of time.

10. **Juvenile Courts: Restitution.** When it is consistent with the purposes of the Nebraska Juvenile Code, a juvenile court may require that a juvenile obtain and maintain employment in order to satisfy restitution obligations.

11. **Juvenile Courts: Restitution: Records.** A juvenile court's order imposing restitution must be supported by the record, but the court may use any rational method to fix the amount of restitution so long as the amount is rationally related to the evidence offered at the dispositional hearing and the amount is consistent with the purposes of education, treatment, rehabilitation, and the juvenile's ability to pay.

Appeal from the County Court for Hall County: ARTHUR S. WETZEL, Judge. Affirmed.

Sidnea L. Brown, Deputy Hall County Juvenile Public Defender, for appellant.

Anna Brokaw and Garrett Schroeder, of Hall County Attorney's Office, for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

STACY, J.

In this juvenile delinquency proceeding, Jeovani H. was placed on probation and ordered to pay restitution as a term and condition of probation. He appeals that disposition, challenging only the restitution requirement. He contends the juvenile court erred in (1) finding him capable of paying

restitution and (2) unfairly limiting the evidence adduced at the restitution hearing. Finding no merit to either contention, we affirm.

## I. BACKGROUND

In 2023, the State filed a petition in the Hall County Court alleging that Jeovani, then 13 years old, was a juvenile as defined under Neb. Rev. Stat. § 43-247(2) (Reissue 2016) due to an act that would constitute the felony of first degree assault. From the record, it appears that Jeovani shoved another youth, causing the youth to fall and fracture his arm. Jeovani denied the allegations in the petition.

A few months later, pursuant to a plea agreement, Jeovani entered an admission to an amended petition alleging that he was a juvenile as defined under § 43-247(1) due to an act that would constitute the misdemeanor of attempted third degree assault. As part of the plea agreement, Jeovani agreed that the amount of restitution owed to his victim for medical expenses was $2,553.05, but Jeovani disputed his ability to pay that amount.

The Hall County Court, sitting as a juvenile court, accepted Jeovani's admission to the amended petition and entered an order adjudicating him pursuant to § 43-247(1). A predisposition investigation was ordered, and the matter was set for a combined hearing to address disposition and restitution.

At the disposition and restitution hearing, the matter of restitution was addressed first. The parties confirmed on the record that they agreed the amount of restitution owed was $2,553.05, but they disagreed as to Jeovani's ability to pay that amount. The court asked Jeovani's counsel if she had evidence to offer, and defense counsel called Jeovani's mother to testify.

### 1. Jeovani's Mother

Jeovani's mother testified that she and her husband have five children living in the household, including Jeovani. Jeovani's mother works day shifts Monday through Friday,

and Jeovani's father works overnight shifts Thursdays through Sundays. Jeovani's oldest brother, who is responsible for getting the younger siblings to school in the mornings, also works overnight shifts. Jeovani's mother testified that because of current work schedules, no one in the household would be available to drive Jeovani to or from a job. She added that Jeovani does not have a driver's license and that even if he were to get a license, the family would not have a spare vehicle he could use. At the end of this line of questioning, Jeovani's counsel told the court, "I have no further questions."

The prosecutor advised the court that she had no questions for Jeovani's mother, but that she had other evidence to present regarding restitution. The court said, "Oh, okay. You may proceed with that." Defense counsel did not object to the procedure, nor did she indicate to the court that she had additional witnesses or evidence on the issue of restitution. The State then called Jeovani as a witness, without objection or further discussion.

## 2. Jeovani

In response to questioning by the State, Jeovani testified that he lives with his parents and siblings. He is not responsible for paying any portion of the household bills, groceries, or rent. At the time of the restitution hearing, Jeovani was not working or actively looking for a job, but he had worked on a corn detasseling crew the "summer [of his] seventh grade year." Jeovani could not recall how much money he earned detasseling, but he testified that he had no money in savings and did not receive an allowance. When asked if there was any reason he could not get a job currently, Jeovani replied, "[M]y parents [are] working. So [is] my brother." But Jeovani admitted he had no physical disability that prevented him from working.

Jeovani testified that he goes to school at 7 a.m. and gets home around 3:30 p.m. Monday through Friday, and he participates in wrestling and football. When asked what he does

on the weekends, Jeovani said, "Go out with friends. Hang out with my friends." When the State asked, "Anything else you do on the weekends?" Jeovani replied, "No."

After eliciting that response, the prosecutor said, "I don't have any other questions for Jeovani." The juvenile court then stated, "All right. You wish to be heard?" No one replied to the court's inquiry, and the State proceeded to call its final witness.

### 3. PROBATION OFFICER

The State called a juvenile probation officer who testified she works in Grand Island, Nebraska, and is familiar with employment opportunities for 14-year-old juveniles in that area, both during the school year and during the summer months. She testified that in addition to "odd job[s]" like shoveling snow, mowing lawns, and picking up yard waste, several fast-food restaurants were willing to hire 14-year-old juveniles. Those restaurants paid juveniles $10.50 per hour and were increasing the pay to $12 per hour in 2024. According to the probation officer, the fast-food restaurants allowed juveniles to work up to 17½ hours per week during the school year, and up to 38 hours per week during the summer, including weekends.

The probation officer also testified that she was familiar with corn detasseling opportunities in the Grand Island area. She said there were two local crews that hired 14-year-old juveniles and one would also pick up detasselers at a local middle school and transport them to and from the fields. Both detasseling crews paid $10.50 per hour for employees with "no experience" and slightly more for employees with experience. Both crews were increasing the minimum hourly wage to $12 in 2024. One crew would allow juveniles to work up to 230 hours during the summer season.

On cross-examination, Jeovani's attorney asked the probation officer several questions about the assessment tool used by juvenile probation to estimate recidivism risk. The officer testified that "[having] a job does not automatically

give them a point . . . to fill their free time or make . . .
their recidivism rate lower." Jeovani's counsel then asked,
"Would an afterschool activity such as wrestling or football
be included in that free time scoring?" The officer replied,
"Yes, that would count for a structured activity." After these
questions, Jeovani's counsel advised the court that she had no
further questions.

## 4. Arguments on Restitution

The court invited argument from both parties on the issue
of restitution. The State urged the court to order restitution
in the agreed-upon amount, and suggested that Jeovani be
placed on a term of probation that allowed him sufficient time
to work over the summer months and earn the money neces-
sary to pay restitution in full. But Jeovani's attorney urged the
court not to impose a restitution order, arguing that Jeovani
did not have the ability to pay restitution and suggesting that
"putting this family in a financial bind to be able to try and
get him to and from a job would be worse than him not being
able to pay restitution to the victim." Defense counsel also
argued that Jeovani would not have time to work because he
was planning to be "involved in wrestling, which would take
up a tremendous amount of his time during the school year,"
and "a good portion of his weekends."

## 5. Court's Ruling on Restitution

Before announcing his ruling, the judge spoke directly to
Jeovani. He explained that he did not want the process of
paying restitution to be a hardship on Jeovani or his family,
but neither did he want the victim's family to experience hard-
ship, and he emphasized the importance of Jeovani's taking
personal responsibility for the consequences of his actions:

> I just think it's extremely important for the victim to
> feel like the system worked for them and I think it's
> extremely important for you to make amends for the
> harm that you did. And I understand that's going to be

troublesome, but I don't think it's anything that's insur-mountable. I think that's something you can do.

The judge acknowledged there may be challenges around transportation to and from work, but he did not think those were insurmountable either. The judge encouraged Jeovani to continue participating in organized sports while he was on pro-bation, because he thought team sports would be "extremely beneficial" for Jeovani and would provide him with structure and a positive peer group. When Jeovani reminded the court that he was already participating in wrestling and might have practice and meets scheduled on weekends, the judge replied, "I understand. That's why I'm going to give you the whole year to try to get this restitution [paid]."

The juvenile court then entered a dispositional order plac-ing Jeovani on a 12-month term of probation subject to sev-eral terms and conditions, one of which was paying restitution in the amount of $2,553.05. It also appears from the record that Jeovani was expected to seek and maintain part-time employment while on probation. Finally, the court advised Jeovani that if he could "get that [restitution] all paid off . . . I have no problem at all with you being released [from proba-tion] early."

Jeovani filed this timely appeal, which we moved to our docket on our own motion.

## II. ASSIGNMENTS OF ERROR

Jeovani assigns, restated, that the juvenile court erred in (1) finding him capable of paying restitution and (2) unfairly limiting the evidence adduced at the restitution hearing.

## III. STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.[1] When the evidence is in conflict, however, an appellate court may give weight to the fact that

---

[1] *In re Interest of Seth C.*, 307 Neb. 862, 951 N.W.2d 135 (2020).

the lower court observed the witnesses and accepted one version of facts over the other.[2]

## IV. ANALYSIS

### 1. Restitution Order

In relation to his first assignment of error, Jeovani argues it was "improper for the juvenile court to order [him] to pay full restitution as he lacks the ability to pay such restitution."[3] To address his argument, we begin by reviewing the principles that govern restitution orders in juvenile delinquency proceedings.

### (a) Restitution Principles

[2,3] A juvenile court has broad discretion as to the disposition of a delinquent child.[4] The foremost purpose and objective of the Nebraska Juvenile Code is to promote and protect the juvenile's best interests, and the juvenile code must be liberally construed to serve the best interests of juveniles who fall within it.[5] In that regard, the Legislature has expressly directed that the juvenile code shall be construed:

> To offer selected juveniles the opportunity to take direct personal responsibility for their individual actions by reconciling with the victims, or victim surrogates when appropriate, through restorative justice practices and fulfilling the terms of the resulting reparation plan which may require apologies, restitution, community service, or other agreed-upon means of making amends.[6]

[4,5] In juvenile delinquency proceedings, orders of restitution are authorized by Neb. Rev. Stat. § 43-286(1)(a) (Cum. Supp. 2022) when such orders are "in the interest of

---

[2] *In re Interest of Gunner B.*, 312 Neb. 697, 980 N.W.2d 863 (2022).

[3] Brief for appellant at 4.

[4] *In re Interest of Seth C., supra* note 1.

[5] *Id*.

[6] Neb. Rev. Stat. § 43-246(4) (Cum. Supp. 2022).

the juvenile's reformation or rehabilitation." In construing § 43-286(1)(a), we have said a juvenile court may order restitution not only for damaged or stolen property, but also for medical expenses.[7]

[6,7] An appropriate restitution order "'serves the salutary purpose of making the offender understand that he [or she] has harmed not merely society in the abstract but also individual human beings, and that he [or she] has a responsibility to' the victim.'"[8] But this salutary purpose is undermined by imposing a restitution order that the juvenile is financially unable to pay.[9] As such, when a juvenile court enters an order of restitution under § 43-286(1)(a), it should consider, among other factors, the juvenile's earning ability, employment status, financial resources, and other obligations.[10]

[8-10] A juvenile court's restitution order should contain "specific requirements and time commitments as to when restitution must be paid" and should be "'set in an amount that is within the realistic ability of the [juvenile] to pay within a reasonable period of time, so that [the juvenile] can complete a probationary period, . . . and move forward.'"[11] A juvenile court may order that restitution be made immediately, in specific installments, or within a specified period of time.[12]

---

[7] *In re Interest of Seth C., supra* note 1, 307 Neb. at 869, 951 N.W.2d at 142 (affirming dispositional order requiring juvenile to pay restitution for victim's medical bills and noting it was "essential for [the juvenile's] reformation and rehabilitation, because it gives [him] the opportunity to take direct personal responsibility for his actions").

[8] *In re Interest of Laurance S.*, 274 Neb. 620, 625, 742 N.W.2d 484, 489 (2007) (quoting *In re Brian S.*, 130 Cal. App. 3d 523, 181 Cal. Rptr. 778 (1982)).

[9] *In re Interest of Laurance S., supra* note 8.

[10] *Id.* See, also, *In re Interest of Brandon M.*, 273 Neb. 47, 727 N.W.2d 230 (2007).

[11] *In re Interest of Laurance S., supra* note 8, 274 Neb. at 625, 742 N.W.2d at 489 (quoting *State v. Kristopher G.*, 201 W. Va. 703, 500 S.E.2d 519 (1997)).

[12] *In re Interest of Laurance S., supra* note 8.

Moreover, when it is consistent with the purposes of the juvenile code, a juvenile court may "require that the juvenile obtain and maintain employment in order to satisfy his or her restitution obligations and his or her responsibility to repay the victim."[13]

[11] A juvenile court's order imposing restitution must be supported by the record, but the court may use any rational method to fix the amount of restitution so long as the amount is rationally related to the evidence offered at the dispositional hearing and the amount is consistent with the purposes of education, treatment, rehabilitation, and the juvenile's ability to pay.[14]

With these restitution principles in mind, we turn now to the parties' arguments regarding Jeovani's ability to pay restitution.

### (b) Parties' Arguments

Jeovani does not challenge the amount of restitution ordered, nor does he dispute the victim's entitlement to restitution for medical expenses related to the assault for which Jeovani was adjudicated. Instead, Jeovani argues the juvenile court erred in ordering him to pay restitution because it "failed to properly consider [his] age, ability to pay, his family's other obligations, and his current employment status."[15] Jeovani points to evidence that he was unemployed at the time of the restitution hearing, and he argues that finding transportation to and from work would be difficult because he does not have a driver's license and his parents have busy work schedules. He also argues that "in order to have free time to find employment [he] would have to quit or limit his after-school sports . . . as they take up much of his free time including weekends."[16]

---

[13] *Id.*, 274 Neb. at 626, 742 N.W.2d at 490.

[14] See *In re Interest of Seth C., supra* note 1.

[15] Brief for appellant at 4.

[16] *Id*. at 6.

The State disagrees. It argues there "was no credible evidence presented that would indicate [Jeovani] lacks the ability to pay, only [that he has] the desire not to as it would interfere with other activities."[17] The State points to evidence that Jeovani has multiple job opportunities that would allow him to earn the money necessary to pay restitution in full within 12 months and still participate in school sports. And, in response to Jeovani's claim that he does not have transportation to get to or from work, the State notes that he appears to have "ample transportation and time available for sports and other extra-curricular activities but not work."[18]

### (c) No Error in Ordering Restitution

We begin by observing that although Jeovani was unemployed at the time of the restitution hearing, the evidence was undisputed that he has no disability that would limit employment, that he has worked detasseling previously, and that ample employment opportunities exist for 14-year-old juveniles in the Grand Island area that would allow Jeovani to earn at least $12 per hour working part time after school, on weekends, and over the summer.

On appeal, Jeovani does not dispute his ability to obtain or maintain part-time employment, nor does he contend that 12 months is not a sufficient period of time to earn the money necessary to pay the full restitution amount. Instead, he argues that employment would inconvenience his parents and would harm, rather than further, his reformation and rehabilitation. We respectfully disagree.

First, to the extent Jeovani can be understood to argue that requiring him to pay restitution will work a hardship on his parents because they "do not have the time or ability to get him to and from employment,"[19] we think he underestimates his ability to arrange his own transportation. We also think

---

[17] Brief for appellee at 11.

[18] *Id.*

[19] Brief for appellant at 5.

Jeovani perhaps fails to appreciate that under Nebraska law, parents can be held strictly liable for medical expenses resulting from personal injury willfully and intentionally inflicted by their minor child.[20] So paying restitution not only allows Jeovani to take direct personal responsibility for the medical expenses incurred by the victim because of his conduct, but it may also reduce his parents' exposure for such damages.

Jeovani's primary argument on appeal is that if he is required to work part time and pay restitution, his participation in extracurricular sports will necessarily suffer. Again, we think Jeovani underestimates his ability to work part time and still participate in extracurricular sports.

We agree with the juvenile court that participation in extracurricular sports can be beneficial to youth involved in juvenile proceedings. We also agree with the juvenile court that it is important for Jeovani to make amends for the harm he caused by paying restitution to the victim. But we see nothing in the record that persuades us Jeovani cannot successfully accomplish both. Indeed, when placing Jeovani on probation, the judge encouraged him to continue participating in organized sports while on probation, and imposed a term of probation designed to allow sufficient time to continue in sports and still work part time to earn the money necessary to pay restitution. And, as additional incentive to work hard, the judge told Jeovani that he could be released from probation as soon as the restitution amount was paid in full.

Having reviewed the record de novo and carefully considered Jeovani's earning ability, employment status, financial resources, and other obligations, we conclude that requiring him to pay restitution to his victim furthers his reformation and rehabilitation and provides him an opportunity to take direct responsibility for his actions. Moreover, we find it is consistent with the purposes of the juvenile code to require Jeovani to obtain and maintain employment in order to satisfy his restitution obligation.

---

[20] See Neb. Rev. Stat. § 43-801 (Reissue 2016).

In sum, the record supports the conclusion that Jeovani has the ability to pay restitution in the agreed-upon amount of $2,553.05 and that he can realistically do so within the 12-month period of his probationary term. Jeovani's first assignment of error has no merit.

## 2. Restitution Hearing Procedure

In his second assignment of error, Jeovani argues that he was "not given a fair opportunity to present his own evidence and dispute the evidence the State was offering as to [his] ability to pay restitution."[21] More specifically, Jeovani claims that his attorney "was allowed to call only one witness" and that when the State called Jeovani to testify, his defense counsel "was never given the opportunity to cross-examine" him.[22] In our de novo review of the record, we find no factual support for these claims.

The procedure followed during the hearing was somewhat informal, but both parties were given a fair opportunity to adduce evidence and examine witnesses on the issue of restitution. The court allowed Jeovani to proceed with evidence first. The defense called Jeovani's mother as a witness; at the conclusion of the mother's direct examination, the State declined the opportunity to cross-examine that witness. The State then called Jeovani as a witness without objection; at the conclusion of Jeovani's direct examination, defense counsel did not respond when the court asked, "[Do you] wish to be heard?" Finally, the State called a juvenile probation officer as a witness; at the end of the officer's direct examination, defense counsel asked two questions on cross-examination and then advised the court she had no further questions. No party advised the court, at any point during or after the hearing, that they had additional evidence to offer. We therefore reject as meritless Jeovani's claim that he was "not allow[ed]"

---

[21] Brief for appellant at 4.

[22] *Id*. at 8.

an opportunity to present or cross-examine witnesses on the issue of restitution.[23]

## V. CONCLUSION

Our de novo review of the record shows that the juvenile court's order to pay restitution in the amount of $2,553.05 is supported by the record, that it is consistent with Jeovani's reformation and rehabilitation, and that Jeovani has the ability to pay the restitution within the time period allowed. Moreover, the record affirmatively disproves Jeovani's claim that he was denied a fair opportunity to present evidence during the restitution hearing. We therefore affirm the juvenile court's dispositional order.

Affirmed.

---

[23] *Id.*